JUDGE CROTTY

11 CIV 3983

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

PUERTO 80 PROJECTS, S.L.U.,

Plaintiff,

v.

United States of America and
Department of Homeland Security,
Immigration and Customs Enforcement,

Defendants.

Civil Action No



**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PUERTO 80'S PETITION FOR RELEASE OF SEIZED PROPERTY AND
IN SUPPORT OF REQUEST FOR EXPEDITED BRIEFING AND
HEARING OF SAME**

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................1

II.  FACTS ........................................................................................................2

     A.   Background Facts..........................................................................2

     B.   Puerto 80's Efforts to Obtain Release of the Subject Domain Names Have
          Proven Futile. ............................................................................4

III. ARGUMENT ................................................................................................7

     A.   Puerto 80 is Entitled to Immediate Release of the Subject Domain Names
          Pursuant to 18 U.S.C. § 983(f)....................................................7

          1.   Puerto 80 has a possessory interest in the seized property. ........8

          2.   There is no risk that the domain names will not be available at the
               time of any eventual trial. ......................................................8

          3.   Puerto 80 will continue to suffer severe hardship if the domain
               names are not immediately released. ......................................9

               a.   If not immediately released, the number of visitors to the
                    Rojadirecta site could be permanently reduced. ..............9

               b.   Seizure of the subject domain names constitutes an
                    unlawful prior restraint on Puerto 80 and its users'
                    protected speech.............................................................10

          4.   The hardship to Puerto 80 substantially outweighs the risk that the
               subject domains will be destroyed, lost, concealed, or transferred...........13

          5.   None of the conditions set forth in 18 U.S.C. § 983(f)(8) is present.........14

               a.   Rojadirecta's linking to material already existing on the
                    Internet does not constitute copyright infringement. ...............15

               b.   Rojadirecta is not violating criminal copyright law.......................17

IV.  CONCLUSION...............................................................................................20

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Accord Kremen v. Cohen*
    489 U.S. 46 (1989)................................................................................. 10

*Arista Records LLC v. Lime Group LLC*
    715 F. Supp. 2d 481 (S.D.N.Y. 2010).......................................... 12, 16

*Artists Music, Inc. v. Reed Publ'g (USA), Inc.*
    Nos. 93 civ. 3428(JFK), 73163, 1994 WL 191643 (S.D.N.Y. May 17, 1994)...................... 17

*Bantam Books v. Sullivan*
    372 U.S. 58 (1963)................................................................................. 12

*BC Technical v. Ensil Int'l, Inc.*
    No. 2:02-cv-700TS, 2008 WL 4318517 (D. Utah Sept. 15, 2008)........................................ 18

*Center for Democracy & Technology v. Pappert*
    337 F. Supp. 2d 606 (E.D. Pa. 2004) ........................................ 11, 12, 13

*Chaim v. U.S.*
    629 F.Supp. 461 (D.N.J. 2001) ............................................................. 9

*Cheek v. United States*
    498 U.S. 192 (1991)............................................................................... 19

*Danjaq LLC v. Sony Corp.*
    263 F.3d 942, 959 (9th Cir. 2001) ...................................................... 18

*Field v. Google Inc.*
    412 F.Supp.2d 1106 (D.Nev. 2006)..................................................... 12

*Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.*
    807 F.2d 1110 (2nd Cir. 1986)............................................................ 19

*Fort Wayne Books, Inc. v. Indiana*
    489 U.S. 46 (1989)................................................... 10, 11, 12, 13

*In Re Application of Madison*
    687 F. Supp. 2d 103 (E.D.N.Y. 2009) .............................................. 13

*Lo-Ji Sales, Inc. v. New York*
    442 U.S. 319 (1979)............................................................................... 11

*Maryland v. Macon*
    472 U.S. 463 (1985)............................................................................... 11

*Mattel, Inc. v. Barbie-Club.com*
    310 F.3d 293, 295 (2d Cir. 2002)..................................................... 2, 9

*Nicholson v. Bd. of Educ. Torrance Unified School Dist.*
    682 F.2d 858 (9th Cir. 1982) ............................................................... 10

*Online Policy Group v. Diebold, Inc.*
   337 F.Supp.2d 1195 (N.D. Cal. 2004) ............................................................ 12

*Pennell v. City of San Jose*
   485 U.S. 1 (1988) ........................................................................................ 10

*Red Lion Broad. Co. v. FCC*
   395 U.S. 367 (1969) .................................................................................... 13

*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*
   467 U.S. 947 (1984) .................................................................................... 10

*Shapiro, Bernstein & Co. v. H.L. Green Co.*
   316 F.2d 304 (2d Cir. 1963) ........................................................................ 16

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns Inc.*
   118 F.3d 955 (2d Cir. 1997), *cert. denied,* 523 U.S. 1020 (1998) ........................ 16

*Sony Corp. v. Universal City Studios, Inc.*
   464 U.S. 417, *reh'g denied,* 465 U.S. 1112 (1984) ........................................ 16

*Ticketmaster Corp. v. Tickets.com, Inc.*
   No. CV 99-7654 HLH(BQRX), 2000 WL 525390 (C.D. Cal. March 27, 2000) ................. 12

*Twin Peaks Prods., Inc. v. Publ'ns Int'l., Ltd.*
   996 F.2d. 1366 (2d. Cir. 1993) .................................................................... 19

*United States v. Acevedo-Cruz*
   No. CRIM. 04-0381(DRD), 2006 WL 448680 (D.P.R. Feb. 23, 2006) ...................... 18, 19

*United States v. All Assets of Blue Chip Coffee, Inc,*
   882 F.Supp.45 (1995) .................................................................................. 9

*United States v. Backer*
   134 F.2d. 533 (2d. Cir. 1943) ...................................................................... 19

*United States v. Comprehensive Drug Testing, Inc.*
   579 F.Supp.3d 989 (9th Cir. 2009) ................................................................ 9

*United States v. Cross*
   816 F.2d 297 (7th Cir. 1987) ...................................................................... 18

*United States v. James Daniel Good Real Property*
   510 U.S. 43 (1993) ...................................................................................... 9

*United States v. Moran*
   757 F. Supp. 1046 (D. Neb. 1991) .............................................................. 18, 19

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*
   425 U.S. 748 (1976) .................................................................................... 13

*Viacom Int'l Inc. v. YouTube, Inc.*
   718 F. Supp. 2d 514 (S.D.N.Y. 2010) ............................................................ 17

## TABLE OF CONTENTS (cont.)

**Statutes**

17 U.S.C. § 506 .................................................................................................. 17

17 U.S.C. § 506(a) ........................................................................................ 17, 18

18 U.S.C. § 981 .................................................................................................... 3

18 U.S.C. § 983(f) ................................................................................ 1, 2, 3, 7, 20

18 U.S.C. § 983(f)(1) ...................................................................................... 7, 14

18 U.S.C. § 983(f)(2) ........................................................................................... 8

18 U.S.C. § 983(f)(3) ........................................................................................ 7, 8

18 U.S.C. § 983(f)(8) ......................................................................................... 14

18 U.S.C. § 2319(a) .............................................................................................. 3

18 U.S.C. § 2323(a)(1) .......................................................................................... 3

**Other Authorities**

3 M. Nimmer & D. Nimmer, *Nimmer On Copyright* § 15.01 (1990) ...................... 18, 19

*Black's Law Dictionary* 317 (9th Ed. 2009) ............................................................ 14

Senate Judiciary Committee Report and the House Committee on Commerce
  Report, H.R. Rep. No. 105-551, pt. 2 (1998) ...................................................... 18

U.S. Dep't of Justice—Computer Crime and Intellectual Property Section,
  Prosecuting Intellectual Property Crimes Manual § III(B)(3) (2001) .................... 18

## I.   INTRODUCTION

On January 31, 2011, Immigration and Customs Enforcement of the U.S. Department of Homeland Security ("ICE") seized two domain names (rojadirecta.com and rojadirecta.org) which pointed to the "Rojadirecta" website.  The domain names were seized pursuant to warrants issued in this District, and were based on an ICE agent's assertion that probable cause existed to believe that the domain names were being used to commit criminal violations of copyright law.

Contrary to the grounds on which the domain names were seized, the Rojadirecta site is not violating copyright law, let alone *criminal* copyright law.  Rojadirecta explained this to the government when, on February 3, 2011, it sent ICE and the Department of Justice a letter requesting immediate return of the subject domain names pursuant to 18 U.S.C. § 983(f). Following that letter, counsel for Puerto 80 Projects, S.L.U. ("Puerto 80" or "Petitioner"), the company which owns the sites, repeatedly tried to discuss the seizure with the government, but was unable to engage with the government until it notified the U.S. Attorney's Office of its intent to seek a temporary restraining order and file a petition for immediate return of the seized domain names.[1]  It was not until then that Puerto 80 was able to have a substantive conversation with the appropriate officials.   Hoping to avoid burdening the court, Puerto 80 held off filing the instant petition pending the outcome of those negotiations.  On May 26, 2011, the government informed counsel for Puerto 80 that the only acceptable "compromise" would entail Puerto 80 prohibiting its users from linking to any U.S. content anywhere on its sites.  Because this "solution" would prohibit Puerto 80 from engaging in lawful acts not prohibited by copyright law, Puerto 80 chose instead to challenge the seizure in court.

As set forth below, immediate release of the subject domain names is warranted under 18 U.S.C. § 983(f) pending the commencement and resolution of any forfeiture proceedings, should

---

[1] Puerto 80's experience appears typical of other website operators whose domain names have been seized by the government, *see* Mike Masnick, *Why We Haven't Seen Any Lawsuits Filed Against The Government Over Domain Seizures: Justice Department*, TECHCRUNCH, May 24, 2011, available at http://www.techdirt.com/articles/20110521/15125114374/why-we-havent-seen-any-lawsuits-filed-against-government-over-domain-seizures-justice-department-stalling.shtml.

the government ever choose to initiate any.  There is no risk that the domain names will be

unavailable for any eventual trial, and Puerto 80 will continue to suffer substantial hardship—a

reduction in traffic to the Rojadirecta site and inability of many of its users to access their

accounts, in addition to a deprivation of First Amendment rights—if the domain names are not

immediately returned to Puerto 80.

Section 983(f) requires this Court to rule on the Petition within 30 days.  But given the

substantial hardship that Puerto 80 is incurring as a result of the continued seizure of the domain

names, fairness requires, and Puerto 80 respectfully requests, that they be released as soon as

possible. And the government has had ample notice (since February) of Puerto 80's intent to file

a petition.  As such, Puerto 80 respectfully requests that the Court set a hearing on this Petition at

the earliest date convenient for the Court's calendar, and preferably no later than June 30, 2011,

and further that the Court direct that the government's opposition papers, if any, be filed no later

than June 23, 2011.  Puerto 80 also respectfully requests that the Court allow *amicus* submissions

on or before June 20, 2011 regarding the issues raised in this Petition.

## II.      FACTS

### A.      Background Facts

Puerto 80 is a Sole Shareholder Limited Liability Company incorporated under the laws

of Spain with its principal place of business in Arteixo, Spain.  Puerto 80 owns the

rojadirecta.org and rojadirecta.com domain names (the "subject domain names"),[2] which are

registered with GoDaddy.com, Inc., 14455 N. Hayden Rd., Suite 219, Scottsdale, Arizona 85260.

Puerto 80 operates the "Rojadirecta" website under the subject domain names. *See* Declaration

of Igor Seoane Miñán in Support of Petition for Release of Seized Property ("Seoane Decl.")

¶¶2-3. The Rojadirecta site is essentially an online discussion group that hosts "forums" in

which users can post messages concerning sports, politics, and other topics.  It also provides a

---

[2] "A domain name is a unique string of characters or numbers that typically is used to designate
and permit access to an Internet website." *Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 295
(2d Cir. 2002).

forum in which users can discuss and post information about highlights from various sporting events, and indexes links to streams of sporting events that can already be found on the Internet. It does not host copyrighted videos or streams of sporting events, and the government does not allege that it does. *Id.* ¶¶ 4, 6. Significantly, following a multi-year legal battle, two Spanish courts specifically held that the website was operating legally and did not infringe copyrights. *Id.* ¶7.

The Rojadirecta site has been listed among the 100 most popular sites in Spain in terms of traffic. *Id.* ¶8. The site has approximately 865,000 registered users, many of whom use their accounts to engage in discussions of sports, politics, and a variety of other subjects on Rojadirecta discussion boards. *Id.* ¶12.

On or about January 31, 2011, the government seized the subject domain names pursuant to 18 U.S.C. §§ 2323(a)(1) (A)-(B) and 18 U.S.C. § 981, based on warrants issued in this District on that date. *See* Declaration of Genevieve Rosloff in Support of Petition for Release of Seized Property ("Rosloff Decl.") ¶ 5, Ex. C. The warrants were issued pursuant to the Affidavit of ICE Special Agent Daniel M. Brazier. *Id.*, Ex. E. In his affidavit, Mr. Brazier asserts that the subject domain names are subject to seizure and forfeiture pursuant to 18 U.S.C. § 2319(a), which provides that "[a]ny person who violates [17 U.S.C. §] 506(a) (relating to criminal [copyright] offenses)" is guilty of a crime. *Id.*

Puerto 80 was not notified of the seizure at the time, and its owner did not find out that the domains had been seized until he visited them shortly after the site was disabled. Seoane Decl. ¶15. On February 3, 2011, Puerto 80 sent a formal request for the immediate return of its property pursuant to 18 U.S.C. 983(f). Rosloff Decl. ¶2, Ex. A. U.S. Customs and Border Patrol issued CAFRA Seizure Notices on February 15, 2011. Declaration of Ragesh Tangri in Support of Petition for Release of Seized Property ("Tangri Decl."), Ex. A.

On March 14, 2011, Ragesh Tangri and David Spears, counsel for Puerto 80, met with attorneys from the United States Attorney's Office ("USAO") for the Southern District of New York. Tangri Decl. ¶7. At that meeting, the government indicated a willingness to engage in

negotiations for the return of the domain names without resort to the judicial process. *Id.* In hopes of avoiding having its property tied up in lengthy forfeiture proceedings, Puerto 80 decided to engage in good faith negotiations with the government and held off filing the instant petition pending the outcome of those discussions. To date, no formal judicial forfeiture proceedings have been initiated.

> **B.    Puerto 80's Efforts to Obtain Release of the Subject Domain Names Have Proven Futile.**

Since the domains were seized, Puerto 80 has undertaken substantial efforts to petition for the return of the subject domain names. As set forth in detail below, its initial efforts at engaging the government in a substantive conversation regarding the seizure proved futile until it served notice of its intention to seek immediate return of the domain names. Counsel for Puerto 80 first contacted the New York Office of Immigrations and Customs Enforcement ("ICE") of the U.S. Department of Homeland Security ("DHS") and the U.S. Attorney's Office for the Southern District of New York ("USAO") on February 3, 2011, by faxing a letter to each agency requesting immediate return of the subject domain names. Rosloff Decl. ¶2, Ex. A. Following that letter, counsel for Puerto 80 contacted both offices numerous times, but was repeatedly directed to contact the other office. Counsel's efforts consisted of the following:

- On Friday, February 4, counsel for Puerto 80 called the New York Office of ICE and requested to speak with the James T. Hayes, the Special Agent in Charge, regarding seizure of the subject domain names. The individual who answered the phone directed counsel to contact Assistant U.S. Attorney ("AUSA") Christopher Frey at the U.S. Attorney's Office for the Southern District of New York. Rosloff Decl. ¶3.

- On the afternoon of February 4, Puerto 80's counsel called Mr. Frey and was put through to his voice mailbox. His recorded message said that he was out of town and to contact Assistant U.S. Attorney Amanda Kramer. Shortly thereafter, counsel was able to reach Ms. Kramer, who requested a copy of the February 3, 2011 letter requesting immediate return of the seized domains. Following counsel's conversation with Ms. Kramer, counsel forwarded her a copy of the February 3 letter. Rosloff Decl. ¶4, Exs. A, B.

- The following Monday, February 7, at approximately 2:00 p.m. Pacific Standard Time, counsel for Puerto 80 spoke on the phone with Ms. Kramer, who stated that she would be speaking with the Chief of the Asset Forfeiture section later that afternoon and would get back to counsel following that conversation. During this

conversation counsel requested from Ms. Kramer a copy of the warrants that were issued authorizing seizure of the subject domain names. Rosloff Decl. ¶5.

- Later in the day on February 7, at approximately 4:00 p.m. Pacific Standard Time, counsel for Puerto 80 had a phone conversation with Ms. Kramer in which she confirmed that the letter dated February 3 began a 15-day period by which the government had to act on Puerto 80's request for an immediate return of the subject domain names. She directed counsel to contact ICE/DHS, stating that DHS, not the USAO or Department of Justice, is the agency with the authority to decide whether to grant the request to release the Subject Doman Names. Counsel informed Ms. Kramer that we had spoken with ICE and that ICE directed us to the Southern District of New York U.S. Attorney's Office, and specifically to Christopher Frey. Counsel also requested a contact for the appropriate office or individual at ICE, but were informed by Ms. Kramer that she did not know the appropriate contact and suggested calling ICE and asking for their general counsel's office. During this conversation, Ms. Kramer also stated that ICE was unlikely to take any action on Puerto 80's request within 15 days. Rosloff Decl. ¶6.

- On February 8, counsel for Puerto 80 again called the New York Office of ICE and explained to the person who answered the phone that the USAO had directed counsel back to them, and asked to be directed to the appropriate office or official. Later that afternoon, counsel received a voice message from the New York Office of ICE, directing her to contact Assistant U.S. Attorney Christopher Frey. Rosloff Decl. ¶7.

- Also on February 8, Puerto 80's counsel called the Intellectual Property Rights Coordination Center ("IPRC") of the Department of Homeland Security, the office which appears to coordinate investigations and seizures related to intellectual property. Counsel was put through to an automated system and instructed to leave a message. Counsel left a message explaining the history of counsel's communications with ICE and the USAO, and asked for someone to return the call. Nobody from ICE or the USAO returned the call. Rosloff Decl. ¶8.

- On February 7, 2011, Durie Tangri attorney Mark Lemley met with Erik M. Silber, Deputy to the Intellectual Property Enforcement Coordinator in the Executive Office of the President, and raised the issue of the seizure of the Rojadirecta domain names. The following day, on February 8, 2011, Mr. Lemley emailed Mr. Silber to follow up on their conversation and confirm his request to be put in touch with appropriate authorities to discuss the seizure. Mr. Silber informed Mr. Lemley that he would try to speak with the appropriate authorities. No one from DOJ contacted Mr. Lemley or the Durie Tangri firm until the afternoon of Friday, February 11, after counsel gave notice of its client's intent to seek expedited relief. Tangri Decl. ¶2 .

- On Friday, February 11, 2011, Puerto 80's counsel left a voicemail message for Ms. Kramer and sent Ms. Kramer an email informing her of Puerto 80's intent to appear in the District Court for the Southern District of New York to seek return of the domain names. Rosloff Decl. ¶9. Shortly thereafter, Assistant U.S. Attorney Christopher Frey left a voicemail for Puerto 80's counsel. *Id.* Durie Tangri attorneys then called, and spoke with Mr. Frey. When asked what the USAO and/or ICE was doing during the fifteen days they had to review and act on Puerto 80's request for immediate return of the property, and whether there

was any chance of a meaningful dialogue with them concerning the disposition of the subject domain names, Mr. Frey stated that he was not in a position to comment. Tangri Decl. ¶ 3.

In a last attempt to reach out to the government before seeking relief in district court, on February 16, 2011, Puerto 80's counsel contacted Sharon Levin, Chief of the Asset Forfeiture Unit in the Southern District USAO. Tangri Decl. ¶4. This contact led to a phone call on February 17 with Puerto 80's counsel and representatives from the USAO. *Id.* ¶¶5-6. During that conversation, the government attempted to dissuade Puerto 80 from filing anything in district court. *Id.* Counsel was also informed during this call that the government issued CAFRA administrative seizure notices for both of the domain names, which were dated February 10 and 15, 2011. *Id.*, Ex. A.

Hopeful of the possibility of obtaining quicker relief through negotiations with the government than through the more costly judicial process, Puerto 80 decided to hold off seeking expedited relief in court. Puerto 80's counsel met with attorneys from the USAO in New York on March 14, 2011, and thereafter continued to attempt to engage with the government to discuss options for the return of the domain names. Tangri Decl. ¶7.[3]

On May 26, 2011, following weeks of prolonged negotiations, the government rejected Puerto 80's offers to compromise, and informed Puerto 80 that it would not agree to return the domain names unless Puerto 80 agreed not to host or permit its users to link to *any* U.S. content anywhere on its sites anywhere in the world. Tangri Decl. ¶8. Because the government's demand requires more than is prohibited under current U.S. law, Puerto 80 decided to move forward with its judicial challenge to the seizure.

Puerto 80 is incurring substantial hardship due to the government's seizure of the subject domain names and its failure to take action on Puerto 80's request for return of the subject domain names. In particular, the seizure blocks all traffic to the site via the subject domain

---

[3] On March 22, 2011, Puerto 80 returned its Asset Claim Forms to the government, in order to preserve its right to claim ownership of and a right to the domain names in any judicial forfeiture proceedings eventually brought by the government. Rosloff Decl. ¶13, Ex. F.

names, damaging Puerto 80's goodwill and risking the permanent loss of its users.  Additionally,

the seizure constitutes an unlawful prior restraint on speech and is infringing Puerto 80's users'

and readers' First Amendment rights, some of whom are U.S. citizens or aliens residing in the

United States.  Seoane Decl. ¶ 9.  Because of the substantial hardship and the absence of any risk

that the seized domain names will be destroyed or otherwise made unavailable for any eventual

trial, as well as the fact that Puerto 80 *has never used the domain names to commit criminal*

*copyright infringement*, their immediate return is warranted under 18 U.S.C. § 983(f).

## III.   ARGUMENT

### A.   Puerto 80 is Entitled to Immediate Release of the Subject Domain Names Pursuant to 18 U.S.C. § 983(f).

Under section 983(f), an individual whose property has been seized is entitled to

"immediate release of the seized property" if:

(A)    the claimant has a possessory interest in the property;

(B)    the claimant has sufficient ties to the community to provide assurance that the property will be available at the time of the trial;

(C)    the continued possession by the Government pending the final disposition of forfeiture proceedings will cause substantial hardship to the claimant, such as preventing the functioning of a business, preventing an individual from working, or leaving an individual homeless;

(D)    the claimant's likely hardship from the continued possession by the Government of the seized property outweighs the risk that the property will be destroyed, damaged, lost, concealed, or transferred if it is returned to the claimant during the pendency of the proceeding; and

(E)    none of the conditions set forth in paragraph (8) applies.

18 U.S.C. § 983(f)(1).

Return of the domain names is proper under section 983(f) because, as set forth below,

the above criteria are met.  Additionally, more than 15 days have passed since Puerto 80

requested to the appropriate official that the property be released.  *See* 18 U.S.C. § 983(f)(3).

1.      **Puerto 80 has a possessory interest in the seized property.**

Puerto 80 is the lawful registrant and owner of rojadirecta.org and rojadirecta.com, and therefore has a possessory interest in the seized property. Seoane Decl. ¶¶2-3.

2.      **There is no risk that the domain names will not be available at the time of any eventual trial.**

The subject domain names were registered with GoDaddy.com, Inc., which is a United States company located in Scottsdale, Arizona. Seoane Decl. ¶3. As ICE Special Agent Daniel M. Brazier notes in his Affidavit in Support of the Application of a Seizure Warrant, the registry for all ".com" top-level domains (such as rojadirecta.com) is Verisign, Inc., 487 East Middlefield Road, Mountain View, CA 94043. *See Id.* ¶3; Rosloff Decl. Ex. E. The registry for all ".org" top-level domains (such as rojadirecta.org) is the Public Interest Registry, 1775 Wiehle Avenue, Suite 200, Reston, VA 20190. The ".org" domain is administered by Afilias USA, Inc., Building 3, Suite 105, 300 Welsh Road Horsham, PA 19044. Seoane Decl. ¶3. The subject domain names will remain under the control of these U.S. registries and registrars at all times. *Id.* Thus, there is no risk that the domain names will not be available at the time of any eventual trial. Unlike tangible property, a domain registrant's "ties to the community," 18 U.S.C. § 983(f)(2), do not play a role in assuring the availability of a domain name at trial, as there is no risk that a domain name can be hidden, destroyed, or otherwise made unavailable by the domain's

registrant.[4] *Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 302 (2d Cir. 2002) (holding that

domain names are personal property located—and subject to *in rem* jurisdiction under the

Anticybersquatting Consumer Protection Act—wherever the registry or the registrar are located).

### 3. Puerto 80 will continue to suffer severe hardship if the domain names are not immediately released.

The continued possession by the government pending the final disposition of forfeiture

proceedings will cause Puerto 80 substantial hardship, including but not limited to, depriving it

of lawful business in the United States and throughout a substantial part of the world.

Additionally, continued seizure of the domain names infringes Puerto 80's users' and readers'

First Amendment rights, thus imposing further hardship.

### a. If not released, the number of visitors to the Rojadirecta site would be permanently reduced.

Since the government seized the subject domain names, the Rojadirecta site has

experienced approximately a 32% reduction in traffic. Seoane Decl. ¶11. Moreover, and more

importantly, the continued possession of the subject domain names will substantially and

irreparably harm the goodwill of the Rojadirecta site and drive its customers away, including by

preventing its registered users from accessing their user accounts from the subject domain

---

[4] In this respect, an Internet domain name is like real property, for which pre-seizure notice and an opportunity to be heard is required by the Fifth Amendment. *See U.S. v. James Daniel Good Real Property*, 510 U.S. 43 (1993) (noting that *ex parte* pre-seizure proceedings "afford[] little or no protection to the innocent owner," and holding that absent exigent circumstances, the government must afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture); *U.S. v. All Assets of Blue Chip Coffee, Inc.*, 882 F. Supp. 45 (1995) (holding that real property seized pursuant to 18 U.S.C. § 981 requires pre-seizure notice and an opportunity to be heard). While we are not aware of any case that specifically analyzes the constitutionality of ex parte pre-seizures of domain names under the Fifth Amendment, the reasoning of *James Daniel Good* and its progeny applies with equal force to the seizure of domain names, which implicate protected speech activities and are not capable of being moved or destroyed. The absence of any pre-seizure notice or hearing (and, as of yet, any post-seizure hearing) provides grounds for this Court to release the domain names pursuant to Fed. R. Crim. P. 41(g), which provides that "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Where, as here, no indictment is pending and no forfeiture proceedings have been initiated by the government, a court may decide a Rule 41(g) motion pursuant to its equitable jurisdiction. *See, e.g., United States v. Comprehensive Drug Testing, Inc.*, 579 F.3d 989, 1001 (9th Cir. 2009); *Chaim v. U.S.*, 692 F. Supp. 2d 461, 468-69 (D.N.J. 2001).

names.[5] *Id.* ¶¶11-12. Users who cannot access the Rojadirecta web sites for a sustained period

of time will eventually stop trying and/or simply go to Rojadirecta's competitors. *Id.* ¶11. And

the Rojadirecta site has approximately 865,000 registered users, many of whom use their

accounts to engage in discussions of sports, politics, and a variety of other subjects on

Rojadirecta discussion boards. *Id.* ¶12. Because of the government's seizure of these domain

names, those registered users are now unable or substantially impeded from accessing their

existing accounts and the information they have stored on those accounts. *Id.* Accordingly,

Puerto 80's business interests have been and will continue to be harmed unless the domain

names are returned to it. *Accord Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003)

("Registering a domain name is like staking a claim to a plot of land at the title office. It informs

others that the domain name is the registrant's and no one else's. Many registrants also invest

substantial time and money to develop and promote websites that depend on their domain names.

Ensuring that they reap the benefits of their investments reduces uncertainty and thus encourages

investment in the first place, promoting the growth of the Internet overall.").

      **b.**      **Seizure of the subject domain names constitutes an unlawful**
                   **prior restraint on Puerto 80's users' protected speech.**

      The seizure imposes another hardship on Puerto 80, in that it constitutes an invalid prior

restraint and suppresses its users' and readers' protected First Amendment activities.[6] *See Fort*

*Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989) ("[W]hile the general rule under the Fourth

Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be

---

[5] While Puerto 80 has been able to transfer its website to other domains (www.rojadirecta.me, www.rojadirecta.es, and www.rojadirecta.in), the primary sites—the .org and .com domains— remain inaccessible to users. Although some users may be able to find these alternative domains, there is no way to communicate the availability of these alternative sites on the .org or .com domains, and the vast majority of users will simply stop visiting the sites altogether, as evidenced by the fact that traffic to the website remains substantially reduced since the seizure.

[6] Puerto 80 is in a position to assert the rights of its users just as effectively as it would itself and thus may raise First Amendment concerns on their behalf. *Nicholson v. Bd. of Educ. Torrance Unified School Dist.*, 682 F.2d 858, 863, n.2 (9th Cir. 1982). *See also Pennell v. City of San Jose*, 485 U.S. 1 (1988) (finding that landlord had standing to raise constitutional challenge to rent control ordinance on behalf of tenants); *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984).

seized on probable cause . . . ., it is otherwise when materials presumptively protected by the First Amendment are involved."). *See also Maryland v. Macon*, 472 U.S. 463, 468 (1985) ("The First Amendment imposes special constraints on searches for and seizures of presumptively protected material, and requires that the Fourth Amendment be applied with 'scrupulous exactitude' in such circumstances.") (internal citation omitted); *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326, n.5 (1979) (noting that the First Amendment imposes special constraints on searches for, and seizures of, presumptively protected materials). In *Fort Wayne*, state and local officials (respondents) filed a civil action pursuant to Indiana's RICO laws, alleging that the defendant bookstores had engaged in a pattern of racketeering activity by repeatedly violating Indiana's obscenity laws. 489 U.S. at 50-51. Prior to trial, respondents petitioned for, and the trial court granted, immediate seizure of the bookstores pursuant to a state law that permitted courts to issue seizure orders "upon a showing of probable cause to believe that a violation of [the State's RICO law] involving the property in question has occurred." *Id.* at 51. On appeal, the Supreme Court held that the pretrial seizure order was unconstitutional, stating that "mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation." *Id.* at 66. As in *Fort Wayne*, the government here has seized an entire business and effectively suppressed all of the expressive content hosted on it, including political discussions, commentary, and criticism by the site's users—without it being determined whether the seizure was "actually warranted" under the relevant statutes. *Id.* at 67.

In *Center for Democracy & Technology v. Pappert*, 337 F. Supp. 2d 606, 619 (E.D. Pa. 2004), the Eastern District of Pennsylvania struck down, on First Amendment grounds, a Pennsylvania statute that permitted the state's Attorney General or a district attorney to seek a court order requiring an Internet Service Provider ("ISP") to "remove or disable items residing on or accessible through" the ISP's service upon a showing of probable cause that the item constituted child pornography. The district court found that the statute imposed an unconstitutional prior restraint on speech. It concluded that under *Fort Wayne Books* and

*Bantam Books v. Sullivan*, 372 U.S. 58 (1963),[7] a court must "make a final determination that material is child pornography *after an adversary hearing before the material is completely removed from circulation.*" *Pappert*, 337 F. Supp. 2d at 657 (emphasis added). The court further noted that the state statute "allow[ed] for an unconstitutional prior restraint because it prevents future content from being displayed at a URL based on the fact that the URL contained illegal content in the past." *Id.*

In the instant case, the government effectively shut down an entire website, suppressing all of the speech hosted on it, based on an assertion that there was probable cause to believe that *some* of the material *linked to* by the website (though not found on the website itself) might be infringing.[8] The site's owner was not provided any advance notice, nor was he provided the opportunity to contest the seizure before (or, for that matter, shortly after) the government shut down the site. Nor were the site's users afforded any notice or opportunity to contest the seizure. Because case law is clear that "mere probable cause to believe a legal violation has transpired is not adequate to remove [protected material] from circulation," *Fort Wayne*, 489 U.S. at 66, the

---

[7] In *Bantam Books*, the Supreme Court held unconstitutional a regulatory scheme by which a state commission sent book publishers and distributors letters requesting that they stop circulating certain "objectionable" material and threatening legal action in the event of non-compliance. 372 U.S. at 61-63. The Court found that this scheme was an unlawful "prior administrative restraint" because it was not an "almost immediate judicial determination of the validity of the restraint," and because the book publishers and distributors were not entitled to a notice or hearing. *Id.* at 70.

[8] Indeed, several courts have held that the act of indexing and linking to copyrighted material—which was the government's basis for seizing the domain names—is not direct or indirect copyright infringement. *See Field v. Google Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006); *see also Ticketmaster Corp. v. Tickets.com, Inc.*, No. CV 99-7654 HLH(BQRX), 2000 WL 525390, at *2 (C.D.Cal. Mar. 27, 2000) (finding that hyperlinking to other sites does not constitute direct infringement); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00 CIV. 4660, (SHS) 2002 WL 1997918, at *4 (S.D.N.Y. Aug. 29, 2002) (unreported) (linking to content does not implicate distribution right and thus, does not give rise to liability for direct copyright infringement); *Online Policy Group v. Diebold, Inc.*, 337 F.Supp.2d 1195, 1202 n.12 (N.D. Cal. 2004) ("Hyperlinking per se does not constitute direct copyright infringement because there is no copying.").

seizure of the expressive materials in this case violates the First Amendment.[9] *See also Pappert*,

337 F. Supp. 2d at 657 (finding that a procedure that permits a judge to make an *ex parte* finding

of probable cause that material is child pornography, with no opportunity for the content

publisher to receive notice or be heard, violates the First Amendment).  This First Amendment

deprivation extends not just to registered users of Rojadirecta, but also to anyone wishing to visit

the website. *See, e.g., Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425

U.S. 748, 756 (1976) ("[T]he protection afforded is to the communication, to its source and to its

recipients both."); *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the right of the

public to receive suitable access to social, political, esthetic, moral, and other ideas and

experiences . . . . That right may not constitutionally be abridged . . . .").

> **4.      The hardship to Puerto 80 substantially outweighs the risk that the
>          subject domains will be destroyed, lost, concealed, or transferred.**

As discussed above, the government's seizure of the domain names under which the

Rojadirecta site operates has and will continue to impose a substantial financial hardship on

Puerto 80.  This hardship far outweighs the risk that the subject domains will be destroyed, lost,

concealed, or transferred, for the simple reason that the domain names *are not capable of being*

*destroyed, lost, concealed, or transferred.*  As explained above, the subject domain names will

remain under the control of the U.S.-based registries and registrars at all times.  The government

will have the ability to regain control of them at any point by directing the registries and

registrars to—as they did in executing the seizure warrants—"make any changes necessary to

---

[9] The instant case is distinguishable from *In Re Application of Madison*, 687 F. Supp. 2d 103
(E.D.N.Y. 2009), in which the court rejected a First Amendment challenge to property seized
pursuant to a search warrant executed in connection with an investigation into alleged violations
of federal anti-rioting statutes.  In *Madison*, the court held *Fort Wayne* and its progeny
inapplicable because the seizure of the property was "not undertaken to stifle any expression;"
rather, it was undertaken to "further an investigation into possible violations of the federal anti-
rioting statute." *Id.* at 110-11.  Here, by contrast, the seizure of the subject domain names *was*
for the purpose of "block[ing] [Petitioner's] distribution or exhibition" of protected material,
which is a "very different matter from seizing a single copy of a film for the *bona fide* purpose of
preserving it as evidence in a criminal proceeding." *Id.* at 110 (quoting *Fort Wayne*, 489 U.S. at
63).  Indeed, the government's seizure of the domain names, far from preserving evidence of
what occurred on those sites, actually destroyed that evidence.

restrain and lock the Subject Domain Names pending transfer of all rights, title, and interest in the Subject Domain Names to the United States upon completion of [any successful] forfeiture proceedings." Rosloff Decl., Ex. C at 4.

Nor are the domains property that may be needed as evidence. While the web sites were operating, the evidence of activity that occurred there was available to the government and to Puerto 80. The government's seizure of the domain names eliminates the continued accessibility information on those sites. The seizure cannot be justified as an attempt to preserve evidence because it does not in fact preserve that evidence; if anything, the government's action destroyed evidence.

### 5.      None of the conditions set forth in 18 U.S.C. § 983(f)(8) is present.

Pursuant to subsection 983(f)(1)(E), immediate return of the property under the statute is not warranted if the seized property—

(A)   is contraband, currency, or other monetary instrument, or electronic funds unless such currency or other monetary instrument or electronic funds constitutes the assets of a legitimate business which has been seized;

(B)    is to be used as evidence of a violation of the law;

(C)   by reason of design or other characteristic, is particularly suited for use in illegal activities; or

(D)   is likely to be used to commit additional criminal acts if returned to the claimant.

18 U.S.C. § 983(f)(8). As set forth below, the seized property does not fall within any of these categories.

*First*, the government has not contended that the subject domain names are contraband, *see* Rosloff Decl., Exs. C and E, nor could they. *See Black's Law Dictionary* 317 (9th Ed. 2009) (defining contraband as "illegal or prohibited trade; smuggling" or "goods that are unlawful to import, export, or possess").

*Second*, the activity that the government is asserting constitutes criminal infringement concerns material that is not hosted on the website that operates under the subject domain names.

The Rojadirecta website merely contains links to *other* websites that in turn host (and permit streaming of) that material. Thus, the domain name itself is not needed as evidence of a violation of the law. And as noted above, if it were needed as evidence by either party, the government's seizure of the domain name destroyed that evidence. However, even to the extent the government believes the domain names themselves will be needed as evidence, they will remain just as available as evidence even if returned to Puerto 80.

*Third,* the subject domain names are not "particularly suited" for illegal activities—they are simply domain names, which point to a website, just like any other domain name points to any other website.

*Fourth*, the government has not shown and cannot show that the site ever was used to commit a criminal act, much less that it will be in the future. By hosting discussion forums and linking to existing material on the Internet, Puerto 80 is not committing copyright infringement, let alone *criminal* copyright infringement, as set forth below.

**a.      Rojadirecta's linking to material already existing on the Internet does not constitute copyright infringement.**

Puerto 80 does not host any infringing material on the websites which operate under the subject domain names. Seoane Decl. ¶4. In the same way a search engine or other site which aggregates links to existing material on the Internet, Rojadirecta provides an index of links to streams of sporting events that can already be found on the Internet through a search for those sites or simply by typing the URL for the site directly. *Id.* Such activity does not constitute direct copyright infringement, much less criminal infringement. *See supra,* at note 8. Indeed, United States Senator Ron Wyden (D-Or) made this point in a letter he wrote to ICE Director John Morton and Attorney General Holder expressing concern over the government's seizure of the subject domain names. *See* Rosloff Decl., Ex. D.

Puerto 80's operation of the Rojadirecta site does not constitute contributory infringement because the subject domain names are capable of—and are, in fact, used for—

substantial non-infringing uses.[10] *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417,

*reh'g denied,* 465 U.S. 1112 (1984); *Arista Records LLC v. Lime Group LLC,* 715 F. Supp. 2d

481, 517-18 (S.D.N.Y. 2010) (summary judgment inappropriate where material fact existed as to

whether file-sharing program, which was "used overwhelmingly for infringement," is "capable

of substantial non-infringing uses.").

Nor is Rojadirecta a site devoted simply to linking to such streams.  In addition to

providing a forum for discussion on sports, politics, and a variety of other topics, the Rojadirecta

site enables users to post links to authorized sports broadcasts.  For example, on Saturday,

February 12, 2011, the Rojadirecta site (hosted on the rojadirecta.es domain name) provided a

link to "9:30am Hockey (NHL): Los Angeles – Washington."  Rosloff Decl. ¶10.  Clicking on

this link opened a new window for the Yahoo! sports website for the National Hockey League,

and provided a live stream of the match between the Los Angeles Kings and Washington

Capitals. *Id.*

Nor does Puerto 80's operation of the Rojadirecta site constitute vicarious liability

because it does not have "a right and ability to supervise that coalesce[s] with an obvious and

*direct financial interest in the exploitation of copyrighted materials.*" *Softel, Inc. v. Dragon*

*Med. & Sci. Commc'ns Inc.,* 118 F.3d 955, 971 (2d Cir. 1997) (quoting *Shapiro, Bernstein & Co.*

*v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir. 1963) (emphasis added)).  Puerto 80 does not

receive any revenue that is derived from specific content hosted on, or streamed by, the sites to

which it links.  Seoane Decl. ¶10.  In other words, Puerto 80 does not receive any revenue from

any site to which a user can link from the subject domain names based upon the content of that

site. *Id.*  To the extent there is any site to which Rojadirecta links that contains infringing

material, Puerto 80 receives no specific financial benefit from a user clicking through to that site

and viewing such content. *Id.* ¶¶5, 10.  Because Puerto 80's revenues are not tied to whether or

not infringing material is linked to or accessed, the government cannot show that Puerto 80 has a

---

[10] Indeed, a domain name is "capable" of directing users to any website, which can host any type

of material.

"direct financial interest in the exploitation of copyrighted materials" which "coalesce[s] with" any right or ability to supervise what is linked to on the site. *See Artists Music, Inc. v. Reed Publ'g (USA), Inc.*, Nos. 93 civ. 3428(JFK), 73163, 1994 WL 191643, at *6 (S.D.N.Y. May 17, 1994) (direct financial benefit not established where defendant leased space at a trade show for a fixed fee to exhibitors who played infringing music, but defendant's revenues were not dependant on whether exhibitors actually played music or what they played); *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 521 (S.D.N.Y. 2010) (in DMCA safe-harbor context, "financial benefit directly attributable to the infringing activity" not established "where the infringer makes the same kind of payment as non-infringing users of the provider's service") (quoting Senate Judiciary Committee Report and the House Committee on Commerce Report, H.R. Rep. No. 105-551, pt. 2 (1998)).

### b.    Rojadirecta is not violating criminal copyright law.

The government bears the burden to prove four elements in a criminal prosecution for copyright infringement under 17 U.S.C. § 506: (i) a valid copyright; (ii) infringement of that copyright; (iii) willfulness; and (iv) either (a) the infringement was for purposes of commercial advantage or private financial gain, or (b) the infringer reproduced or distributed, during any 180-day period, one or more copies or phonorecords of one or more copyrighted works, with a total retail value of more than $1,000. 17 U.S.C. § 506(a). Here, the seizure warrant issued in the absence of a showing of these elements, and the government cannot establish that the activities of the Rojadirecta site meets them.

As set forth above, the government can show neither the required element of infringement nor financial gain. Puerto 80 does not itself copy or distribute any sports broadcasts. Nor does it obtain a private financial gain by any infringement by others, because it does not run advertising against that content or receive payment from sites that stream that content. Seoane Decl. ¶ 10.

Nor can the government show the element of "willfulness." A majority of courts have

found that "willfulness" is not satisfied by a showing of mere intent to copy, but requires the government to prove that there was a voluntary, intentional violation of a known legal duty or that the defendant intended to violate copyright law. *See* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 15.01 (1990); *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 959 (9th Cir. 2001) (one who has been notified that his conduct constitutes copyright infringement, but who reasonably and in good faith believes the contrary, has not acted willfully); *United States v. Cross*, 816 F.2d 297, 300 (7th Cir. 1987) (jury was instructed that "(t)he word 'willfully' as used in the statute means the act was committed by a defendant voluntarily, with knowledge that it was prohibited by law, and with the purpose of violating the law, and not by mistake, accident or in good faith"); *BC Technical v. Ensil Int'l, Inc.*, No. 2:02-cv-700TS, 2008 WL 4318517, at *3 (D. Utah Sept. 15, 2008) (finding element of willfulness was lacking under 17 U.S.C. § 506(a) where there was no showing that alleged copyright infringer had knowledge that its actions would violate copyright law); *United States v. Moran*, 757 F. Supp. 1046, 1050-52 (D. Neb. 1991) (holding that "willfully" under the criminal copyright statute meant defendant must have voluntarily intended to violate a known legal duty; mere intent to copy was insufficient); *United States v. Acevedo-Cruz*, No. CRIM. 04-0381(DRD), 2006 WL 448680, at *3 (D.P.R. Feb. 23, 2006) ("willfulness" means having specific intent to violate a known legal duty, not merely having the intent to copy and not to infringe). *See also* U.S. Dep't of Justice—Computer Crime and Intellectual Property Section, Prosecuting Intellectual Property Crimes Manual § III(B)(3) (2001), at http://www.justice.gov/criminal/cybercrime/ipmanual/02ipma.html (last visited May 31, 2011) (factors that can establish willfulness include evidence that a defendant had legal or actual notice that conduct similar to his constituted infringement or that he acknowledged his conduct was improper).[11]

---

[11] In 1943, the Second Circuit held that that willful intent only need be shown relating to intent to copy the works, not intent to infringe the copyright. In *U.S. v. Backer*, 134 F.2d 533, 535 (2d Cir. 1943), the Second Circuit affirmed the conviction of a maker of collectible figurines that copied another artist's figurines even though the defendant told his supplier to make the figurines look "as closely as they might without 'copyright trouble.'" However, since then, the Second Circuit has articulated the standard for willfulness, in a civil context, as "whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded the

In *Moran*, an owner of a movie rental business was convicted for violating a federal copyright statute with a "willful" requirement. The court held that "'willfully,' when used in 17 U.S.C. § 506(a), means a 'voluntary, intentional violation of a known legal duty.'" *Moran,* 757 F. Supp. at 1050-51 (quoting *Cheek v. United States*, 498 U.S. 192, 200-02 (1991)). In reaching this conclusion, the court examined the damages provisions of the Copyright Act for civil infringement, which allow enhanced statutory damages where infringement is committed "willfully." *Moran* 757 F. Supp. at 1050. Citing a number of cases and a leading copyright treatise, the court concluded that "the term 'willful,' when used in the civil statutory damages statute, has consistently been interpreted to mean that the infringement must be 'with knowledge that the defendant's conduct constitutes copyright infringement.'" *Id.* at 1049 (quoting M. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 14.04[B][3] at 14-40.3-14-40.4 (1990)). The court also compared criminal copyright infringement to other "complex statutory schemes, such as the federal criminal tax statutes," which likewise require a showing of intentional violation of a known legal duty. *Moran,* 757 F. Supp. at 1049. Accordingly, the court determined that "willfully" requires proof that the defendant specifically intended to violate copyright law. *Id.* at 1050-51.

Likewise, in *Acevedo-Cruz*, the Court held that "willfulness" means having specific intent to violate a known legal duty, not merely having the intent to copy and not to infringe. *Acevedo-Cruz*, 2006 WL 448680, at *3. Noting that the circuits that confronted the issue adopted "willful" to mean that the infringement was with knowledge that the defendant's conduct constituted copyright infringement and that "there is absolutely nothing in the text of the criminal copyright statute or its legislative history suggesting the meaning Congress attributed to *willful*," the court found "no compelling reason to adopt a less stringent requirement in the

---

possibility." *See Twin Peaks Prods., Inc. v. Publ'ns Int'l., Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993); *see also Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1115 (2d Cir. 1986) ("We agree that a defendant's knowledge that its actions constitute an infringement establishes that the defendant acted willfully within the meaning of § 504(c)(2) for purposes of enhancing statutory damages."). The government cannot meet either standard in this case.

criminal copyright context than in the civil context." *Id.* (emphasis in original).

In this case, there was no probable cause to believe that Puerto 80 "willfully" infringed any valid copyright, nor will the government be able to show that Puerto 80 was aware that its conduct was tantamount to copyright infringement. To the contrary, Puerto 80's conduct has been validated by Spanish courts. Following allegations of copyright infringement, the court ruled in 2009 that the Rojadirecta sites did not violate any copyright laws. Seoane Decl. ¶7, Ex. 2. One year later, in an appeal of that decision, the Madrid Provincial Court affirmed the lower court's ruling and held that "the reported actions do not constitute a crime, and the decision to dismiss the action is in accordance with law." Seoane Decl. ¶7, Ex. 1. These rulings are significant to the instant proceedings given that Spain, like the United States, is a signatory to the Berne Convention and thus adheres to the same minimum standards of protection for copyrighted works. United States courts would likely reach the same conclusion if and when the government ever decided to bring a cause of action against Puerto 80 alleging copyright infringement. And even if courts in this country were ultimately to rule differently, Puerto 80 certainly has a reasonable belief in the legality of its web site under the copyright laws, having already successfully proven that legality in court.

## IV.   CONCLUSION

For the reasons set forth above, Petitioner Puerto 80 respectfully requests that the Court grant its 18 U.S.C. § 983(f) Petition, and enter an order directing the government to effectuate the immediate return of the rojadirecta.com and rojadirecta.org domain names to Puerto 80 by directing the domain names' registries and registrars to return and to make any changes necessary to reflect the return of the domain names to Puerto 80. While acknowledging that the Court has 30 days on which to rule on this Petition, Puerto 80 respectfully requests that the Court set a hearing on this Petition at the earliest date convenient for the Court's calendar, and preferably no later than June 30, 2011, and further direct that the government's opposition papers, if any, be filed no later than June 23, 2011. Puerto 80 also respectfully requests the Court

to allow *amicus* submissions related to the issues presented in this Petition to be filed no later than June 20, 2011.

SPEARS & IMES LLP

Dated:  June 13, 2011                    By: _____

David Spears
Charlita Mays
51 Madison Avenue, 25th Floor
New York, NY 10010
Tel. (212) 213-6996
Fax (212) 213-0849

*Attorneys for Petitioner*
PUERTO 80 PROJECTS, S.L.U.

Mark A. Lemley (*Pro Hac Application to be filed*)
Ragesh K. Tangri (*Pro Hac Application to be filed*)
Johanna Calabria (SBN JC3915)
Genevieve P. Rosloff (*Pro Hac Application to be filed*)

DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA  94111
Tel. (415) 362-6666

*Attorneys for Petitioner*
PUERTO 80 PROJECTS, S.L.U.