**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PUERTO 80 PROJECTS, S.L.U., | |
| Plaintiff, | |
| v. | Civil Action No. 1:11-cv-03983-PAC |
| United States of America and Department of Homeland Security, Immigration and Customs Enforcement, | |
| Defendants. | |

**BRIEF OF *AMICI CURIAE* ELECTRONIC FRONTIER FOUNDATION, CENTER FOR DEMOCRACY AND TECHNOLOGY, AND PUBLIC KNOWLEDGE IN SUPPORT OF PUERTO 80'S PETITION FOR RELEASE OF SEIZED PROPERTY**

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND............................................................................................................. 1

   A.   Operation In Our Sites. .......................................................................................... 1

   B.   Seizure In the Form of Website Redirection............................................................ 2

   C.   Collateral Damage .................................................................................................. 4

III.   ARGUMENT ................................................................................................................. 7

   A.   The Government's Seizure of Petitioner's Domain Names Violated the
        Substantive Requirements of the First Amendment. ............................................... 7

        1.   Intermediate Scrutiny Applies to Government Seizures of Domain Names
             Allegedly Associated with Criminal Copyright Infringement. ...................... 7

        2.   The Government's Overbroad Seizures Violated the First Amendment
             Rights of Internet Users Who Wished to Access Protected Material on
             Petitioner's Site. .......................................................................................... 8

        3.   The Harm to First Amendment Rights Resulting from The Government's
             Seizure Is Far Greater Than Necessary to Further an Important
             Governmental Interest. ................................................................................. 8

   B.   The Government's Seizure of Petitioner's Domain Names Violated the
        Procedural Requirements of the First Amendment............................................... 10

        1.   First Amendment Prohibition on Prior Restraints....................................... 10

        2.   A Mere Showing of "Probable Cause" Does Not Justify a Prior Restraint. . 11

        3.   The Lack of a Prior Adversarial Hearing Renders the Domain Name
             Seizure Invalid........................................................................................... 12

   C.   The Seizure Warrant Ignored the Judgment of Two Spanish Courts,
        Disregarding Important International Norms......................................................... 13

        1.   The Seizure Order Should Not Have Issued Without Consideration of the
             Foreign Judgment of Non-Infringement...................................................... 13

        2.   The Rojadirecta Seizure Sends a Dangerous Signal. ................................... 14

IV.   CONCLUSION............................................................................................................. 15

# TABLE OF AUTHORITIES

## Federal Cases

*Ackermann v. Levine*,
   788 F.2d 830 (2d Cir. 1986)..................................................................... 13, 14

*Alexander v. United States*,
   509 U.S. 544 (1993) ...................................................................................... 10

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) ................................................................................... 10, 11

*Blount v. Rizzi*,
   400 U.S 410 (1971)........................................................................................ 12

*Capital Cities Media, Inc. v. Toole*,
   463 U.S. 1303 (1983)...................................................................................... 11

*Clarkson Co., Ltd. v. Shaheen*,
   544 F.2d 624 (2d Cir. 1976)............................................................................ 13

*Ctr. for Democracy and Tech. v. Pappert*,
   337 F. Supp. 2d 606 (E.D. Pa. 2004) ............................................................ 5, 7

*Cunard S.S. Co. v. Salen Reefer Servs. AB*,
   773 F.2d 452 (2d Cir. 1985)............................................................................ 13

*Fort Wayne Books v. Indiana*,
   489 U.S. 46 (1989).............................................................................. 11, 12, 13

*Freedman v. Maryland*,
   380 U.S. 51 (1965)................................................................................... 10, 11

*FW/PBS, Inc. v. Dallas*,
   493 U.S. 215 (1990)....................................................................................... 11

*Heller v. New York*,
   413 U.S. 483 (1973)....................................................................................... 12

*Hynes v. Mayor & Council of Borough of Oradell*,
   425 U.S. 610 (1976).......................................................................................... 9

*Kenner Products Co. v. Societe Fonciere et Financiere Agache-Willot*,
   532 F.Supp. 478 (S.D.N.Y. 1982) ................................................................... 14

*Kingsley Books, Inc. v. Brown*,
   354 U.S. 436 (1957)........................................................................................ 11

*Marcus v. Search Warrant of Property*,
    367 U.S. 717 (1961) ............................................................................................. 12

*Martin v. City of Struthers*,
    319 U.S. 141 (1943) ............................................................................................. 8

*Maryland v. Macon*,
    472 U.S. 463 (1985) ............................................................................................. 9

*NAACP v. Button*,
    371 U.S. 415 (1963) ............................................................................................. 9

*New York v. P.J. Video, Inc.*,
    475 U.S. 868 (1986) ............................................................................................. 12

*Pariente v. Scott Meredith Literary Agency*,
    771 F. Supp. 609 (S.D.N.Y. 1991) ...................................................................... 14

*Peterson v. Nat'l Telecomms. & Info. Admin.*,
    478 F.3d 626 (4th Cir. 2007) .............................................................................. 3

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004) ............................................................................... 3

*Reno v. ACLU*,
    521 U.S. 844 (1997) ............................................................................................. 8

*Sarl Louis Feraud Int'l v. Viewfinder, Inc.*,
    489 F.3d 474 (2d Cir. 2007) ............................................................................... 14

*Schneider v. New Jersey*,
    308 U.S. 147 (1939) ............................................................................................. 9

*Se. Promotions, Ltd. v. Conrad*,
    420 U.S. 546 (1975) ....................................................................................... 10, 11

*Staub v. City of Baxley*,
    355 U.S. 313 (1958) ............................................................................................. 11

*Tahan v. Hodgson*,
    662 F.2d 862 (D.C. Cir. 1981) ........................................................................... 14

*Telenor Mobile Commc'ns AS v. Storm LLC*,
    584 F.3d 396 (2d Cir. 2009) ............................................................................... 13

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) ............................................................................................. 7

*United States v. O'Brien*,
   391 U.S. 367 (1968) ..................................................................................... 7

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ..................................................................................... 9

*Vill. of Schaumburg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980) ..................................................................................... 9

**Federal Statutes**

18 U.S.C. § 981 ....................................................................................... 7, 10

18 U.S.C. § 2319 ......................................................................................... 12

18 U.S.C. §§ 2323, *et seq.* .................................................................... *passim*

PRO-IP Act of 2008, Pub. L. No. 110-403, 122 Stat. 4256 (2008) .................................... 1

**Other Authorities**

Nate Anderson, *Senator: Domain Name Seizures "Alarmingly Unprecedented"*, Ars
   Technica (Feb. 2, 2011) ............................................................................. 6, 7

Hillary Clinton, U.S. Sec'y of State, *Internet Rights And Wrongs: Choices & Challenges
   In A Networked World*, U.S. Dep't of State (Feb. 15, 2011) ........................................ 15

*Lofgren, Wyden Question Response to Seizure Inquiries*, Congresswoman Zoe Lofgren's
   Website ............................................................................................. 7

Mike Masnick, *ICE Declares 'Mission Accomplished' On Domain Seizures* (June 10,
   2011) ................................................................................................ 2

Corynne McSherry, *U.S. Government Seizes 82 Websites: A Glimpse at the Draconian
   Future of Copyright Enforcement?*, Electronic Frontier Foundation (Nov. 29, 2010)... 2

*"Operation In Our Sites" Targets Internet Movie Pirates*, U.S. Immigration and Customs
   Enforcement Newsroom (June 30, 2010) ................................................................ 2

*ICE Seizes 82 Website Domains Involved in Selling Counterfeit Goods as Part of Cyber
   Monday Crackdown*, U.S. Immigration and Customs Enforcement Newsroom (Nov.
   29, 2010) ............................................................................................ 2

Ben Sisario, *Piracy Fight Shuts Down Music Blogs*, N.Y. Times (Dec. 13, 2010)........ 4, 6

Letter from Sen. Ron Wyden to John Morton, Director, ICE, and Eric Holder, Attorney
   General (Feb. 2, 2011) ............................................................................... 6

*New York Investigators Seize 10 Websites That Illegally Streamed Copyrighted Sporting*

*and Pay-Per-View Events*, U.S. Immigration and Customs Enforcement Newsroom (Feb. 2, 2011) ............................................................................................................ 2

Presentation of Erik Barnett to U.S. Chamber of Commerce (March 24, 2011) ............... 2

I.      **INTRODUCTION**

Amici file this brief because this Court may be the first to confront a novel and important issue: whether the seizure of the domain names of websites that necessarily contain non-infringing speech, but are alleged to contain infringing content as well, can survive First Amendment scrutiny.  It cannot, particularly on the facts of this case.

In the past several months, United States government agencies have embarked on a large-scale effort to aggressively enforce intellectual property rights online. Unfortunately, that campaign is causing significant collateral damage — as happened here.  The government's seizure of the Rojadirecta domain names violated both the substantive and procedural requirements of the First Amendment.  Further, because the issuing court apparently did not consider the findings of two Spanish courts that Puerto 80 has not violated copyright law, the seizure order sent a dangerous signal to foreign governments that the U.S. executive and judicial branches are willing to disregard the liability determinations of foreign courts — inviting them to do the same.

Amici urge the Court to grant Puerto 80's petition.

II.     **BACKGROUND**

The Rojadirecta seizure is part of a broader enforcement tactic that appears to be fundamentally flawed.

A.      **Operation In Our Sites.**

Over the past few years, responding to pressure by major intellectual property owners and their representatives, the U.S. government has dramatically increased its efforts to stamp out infringing activities online.  One of the principal legal tools the government is wielding is the forfeiture provisions of 18 U.S.C. § 2323.  As amended by the PRO-IP Act of 2008,[1] the provisions purportedly authorize the government to seek in rem warrants for the seizure of property used to commit infringement.

---

[1] PRO-IP Act of 2008, Pub. L. No. 110-403, 122 Stat. 4256 (2008).

In June 2010, Immigration and Customs and Enforcement (ICE) launched "Operation In Our Sites" seeking and "executing" warrants against nine domain names associated with websites that allegedly offered unauthorized movie downloads.[2]  In November 2010, the government seized an additional 82 domain names, alleging the sites were used to sell counterfeit goods and illegally copied DVDs.[3]  In February 2011, ICE executed seizure warrants against ten more domain names, this time based on allegations that the sites associated with those domains linked to unauthorized streamed sports broadcasts.[4]  The project shows no signs of slowing:  Assistant Deputy Director Erik Barnett has publicly stated that ICE views the operation as a great success.[5]

### B. Seizure In the Form of Website Redirection.

The term "seizure" is a misnomer in this context.  One normally thinks of seizure in connection with the appropriation of real goods, such as counterfeit handbags or cars used in the commission of a crime.  In these cases, however, the government has used section 2323 to require service providers to lock domain names pending transfer to the government, and to direct those domains to a web page announcing they have been seized.

---

[2] *"Operation In Our Sites" Targets Internet Movie Pirates*, U.S. Immigration and Customs Enforcement Newsroom (June 30, 2010), http://www.ice.gov/news/releases/1006/100630losangeles.htm.

[3] *ICE Seizes 82 Website Domains Involved in Selling Counterfeit Goods as Part of Cyber Monday Crackdown*, U.S. Immigration and Customs Enforcement Newsroom (Nov. 29, 2010), http://www.ice.gov/news/releases/1011/101129washington.htm; *see also* Corynne McSherry, *U.S. Government Seizes 82 Websites: A Glimpse at the Draconian Future of Copyright Enforcement?*, Electronic Frontier Foundation (Nov. 29, 2010), http://www.eff.org/deeplinks/2010/11/us-government-seizes-82-websites-draconian-future.

[4] *New York Investigators Seize 10 Websites That Illegally Streamed Copyrighted Sporting and Pay-Per-View Events*, U.S. Immigration and Customs Enforcement Newsroom (Feb. 2, 2011), http://www.ice.gov/news/releases/1102/110202newyork.htm.

[5] Presentation of Erik Barnett to U.S. Chamber of Commerce (March 24, 2011), http://cl.exct.net/?qs=97ad19bd2c8d6385f0a5dcb49889b6baf8b18004be8faad2c9189fdd60d571a6; *see also* Mike Masnick, *ICE Declares 'Mission Accomplished' On Domain Seizures* (June 10, 2011), http://www.techdirt.com/articles/20110608/ 20310614626/ice-wants-european-countries-to-join-domain-seizure-party.shtml.

To understand precisely what has occurred, it is helpful to clarify the terms "websites," "IP addresses," and "domain names." A "website" is "a collection of related web pages, images, videos or other digital assets that is hosted on one web server."[6] An "IP address" is a unique, numerical sequence — like "205.178.190.22" or "208.132.238.34" — assigned to every computer connected to the Internet that functions much like a street address or telephone number for the computer to which it is assigned.[7] A domain name is an easy-to-remember text representation (often a word or phrase) that is linked through the "domain name system" to the IP Address.[8] A series of domain name servers contains massive databases that list the proper IP address for each domain name.[9]

To analogize to the "real world," a website is akin to a building, such as the Empire State Building. An IP address is like the address of the building, "350 5th Avenue, New York, NY 10001," while the domain name is the commonly known way to refer to the building — *e.g*., the words "Empire State Building." Finally, the "domain name system" is like a "yellow pages" directory that one can use to look up "Empire State Building" and learn that it is located at "350 5th Avenue, New York, NY 10001." Thus, the court order authorizing the seizure of the domain names in this case is akin to ordering the publisher of the yellow pages to transfer ownership of the listing for "Empire State Building" (which points visitors to "350 5th Avenue, New York, NY 10001") so that they may order it erased or, as actually occurred, point visitors to a different address in which a notice of infringement has been posted. To complete the analogy, the seizure

---

[6] *See Website*, Wikipedia, http://en.wikipedia.org/wiki/Website (last visited June 19, 2011).

[7] *See, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 409-410 (2d Cir. 2004).

[8] *See, e.g., Register.com, Inc.*, 356 F.3d at 410. *See also Peterson v. Nat'l Telecomms. & Info. Admin.*, 478 F.3d 626, 629 (4th Cir. 2007) (describing domain name system); *Domain Name System*, Wikipedia, http://en.wikipedia.org/wiki/Domain_name_system (last visited June 19, 2011).

[9] *See Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 577 (2d Cir. 2000) (describing the domain name server system in detail).

replaces the listing for the Empire State Building with the statement "The Empire State Building is closed."

### C.      Collateral Damage.

The Operation's "success" has come at a high price for speech.  While many of the domain names in question doubtless were associated with websites that were dedicated to infringing activity, there have been a number of reports of overbroad takedowns and/or fundamental flaws in the affidavits upon which the judges issuing the seizure orders have relied.

For example, the November seizures targeted several websites, including several music blogs that clearly were not dedicated to infringing activities, even if some portion of the content of their site may arguably have run afoul of copyright law.  One site, OnSmash.com, was a popular music blog that included links to hip-hop music. According to the site owners, much of the music was provided by the musicians themselves, or their labels.[10]  While these musicians may or may not have been authorized to make their music available in this way (the artists may not own the actual copyright), OnSmash can hardly be faulted for supposing that it was permitted to support the links absent a complaint.  Further, OnSmash complied with takedown notices under the Digital Millennium Copyright Act.[11]  In short, it was hardly a "pirate" site.  Other music blogs, such as dajaz1.com, fell into the same boat.[12]

Perhaps the most egregious example of collateral damage resulting from a domain seizure occurred in a contemporaneous ICE campaign using the exact domain seizure process at issue in this case (but targeting child pornography rather than infringement). In February 2011, ICE seized the "mooo.com" domain for allegedly pointing to illegal

---

[10] Ben Sisario, *Piracy Fight Shuts Down Music Blogs*, N.Y. Times (Dec. 13, 2010), http://www.nytimes.com/2010/12/14/business/media/14music.html.
[11] 17 U.S.C. § 512(c).
[12] Ben Sisario, *Music Websites Dispute Legality of Their Closing,* N.Y. Times (Dec. 19, 2010), http://www.nytimes.com/2010/12/20/business/media/20music.html.

content.  The seizure resulted in over 84,000 subdomains of mooo.com being temporarily blocked.[13]  Mooo.com is a domain used by FreeDNS, a service that allows users to register subdomains, which they can then point to Internet content hosted at any IP address.  No content is hosted immediately under the mooo.com domain; all content — including personal blogs, discussion forums, small business sites, and sites where academic researchers share papers and professional information — is hosted under subdomains that take the form "username.mooo.com."[14]  The content hosted under any particular subdomain is wholly distinct from the content hosted under other subdomains. But because of illegal content allegedly present at one such subdomain, *all* were blocked when the "parent domain," mooo.com, was seized.  This is the *exact* form of overblocking that led a district court to find a Pennsylvania Internet blocking law unconstitutional in *Ctr. for Democracy and Tech. v. Pappert*, 337 F. Supp. 2d 606, 652-53 (E.D. Pa. 2004).[15]  While the legal context is somewhat different, Amici fear the "Operation In Our Sites" and mooo.com seizures bespeak a similar institutional disregard for the collateral impact of the government's domain name seizure efforts.

The government also appears to rely not just on its own investigation but on one-sided sources of information.  For example, the government affidavit that led to the music blog seizures described above cites repeatedly to "discussions" with, and reports prepared by, the Motion Picture Association of America (MPAA), the Recording Industry Association of America (RIAA), and the International Federation of the Phonographic Industry (IFPI).[16]  It appears that these sources may not have pointed out to the

---

[13] Thomas Claburn, *ICE Confirms Inadvertent Web Site Seizures*, Information Week (Feb. 18, 2011),
http://www.informationweek.com/news/security/vulnerabilities/229218959.  A subdomain is a division of a domain, such as "subdomain.example.com".
[14] *See, e.g,* William's Personal Web Server & Random Thoughts,
http://greyghost.mooo.com (last visited June 19, 2011); Bluebird Jewelry Design by Stephanie Waldie, http://cowbell.mooo.com/catalog/index.php (last visited June 19, 2011).
[15] *See infra* Part IV, section A.1.
[16] *See* Appl. and Aff. for Seizure Warrant [of Andrew T. Reynolds, signed Nov. 17,

government the myriad non-infringing (and, at the very least, noncriminal) activities taking place on the sites, and may not have acknowledged that some of the song files identified might have been sent by the labels themselves.  Indeed, the owner of dajaz1.com showed the New York Times evidence that the four songs the government stated it downloaded from Dajaz1.com were sent to him by music labels and third party marketers.[17]

Leading Congressional representatives have expressed deep concern over the ICE seizures.[18]  In an open letter to ICE, Senator Ronald Wyden questioned ICE procedures:

> [I]n contrast to ordinary copyright litigation, the domain name seizure process does not appear to give targeted websites an opportunity to defend themselves before sanctions are imposed.  As you know, there is an active and contentious legal debate about when a website may be held liable for infringing activities by its users.  I worry that domain name seizures could function as a means for end-running the normal legal process in order to target websites that may prevail in full court.  The new enforcement approach used by Operation In Our Sites is alarmingly unprecedented in the breadth of its potential reach. . . . If the federal government is going to take property and risk stifling speech, it must be able to defend those actions not only behind closed doors but also in a court of law.[19]

And, in a statement issued in conjunction with ICE's response to a similar letter, Representative Zoe Lofgren expressed concern that the agency had

> fail[ed] to address legitimate concerns about "Operation In Our Sites." Domain seizures without due process are a form of censorship.  In this instance, our government has seized domains with nothing more than the rubber stamp of a magistrate, without any prior notice or adversarial process, leaving the authors of these sites with the burden of proving their innocence.  While this might be enough for the seizure of stolen cars or

---

2010], No. 10-2822, (C.D. Cal. Nov. 17, 2010), *available at* http://www.docstoc.com/docs/67610787/45705510-Operation-in-Our-Sites-2-0.

[17] Sisario, *supra* note 12.

[18] Nate Anderson, *Senator: Domain Name Seizures "Alarmingly Unprecedented"*, Ars Technica (Feb. 2, 2011), http://arstechnica.com/tech-policy/news/2011/02/senator-us-domain-name-seizures-alarmingly-unprecedented.ars.

[19] Letter from Sen. Ron Wyden to John Morton, Director, ICE, and Eric Holder, Attorney General (Feb. 2, 2011), *available at* http://wyden.senate.gov/download/?id=103d177c-6f30-469b-aba8-8bbfdd4fd197.

knock-off handbags, it is not enough for web sites and speech on the Internet.[20]

Simply put, Petitioner and Amici are not alone in their concern that domain name seizures raise issues that require careful judicial scrutiny.

## III.   ARGUMENT

### A.   The Government's Seizure of Petitioner's Domain Names Violated the Substantive Requirements of the First Amendment.

The government's use of the civil forfeiture procedures purportedly authorized pursuant to 18 U.S.C. §§ 2323(a)(1) (A)-(B) and 18 U.S.C. § 981 constituted an illegal prior restraint that unnecessarily burdens First Amendment rights.

#### 1.   Intermediate Scrutiny Applies to Government Seizures of Domain Names Allegedly Associated with Criminal Copyright Infringement.

Regulations that impact speech but that are unrelated to the content of that speech are subject, at minimum, to an intermediate level of scrutiny. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). *See also Ctr. for Democracy and Tech. v. Pappert*, 337 F. Supp. 2d 606, 652-53 (E.D. Pa. 2004). Domain names are essential to the dissemination of online speech; therefore their seizure is subject — at minimum — to intermediate scrutiny. As set forth by the Supreme Court in *United States v. O'Brien*, 391 U.S. 367 (1968), intermediate scrutiny requires that a regulation "[1] furthers an important or substantial governmental interest; [2] the governmental interest is unrelated to the suppression of free expression; and [3] the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id*. at 377. *See also Pappert*, 337 F. Supp. 2d at 653.

---

[20] *Lofgren, Wyden Question Response to Seizure Inquiries*, Congresswoman Zoe Lofgren's Website, http://lofgren.house.gov/index.php?option=com_content &task=view&id=637&Itemid=125 (last visited June 19, 2011); *see also* Nate Anderson, *Silicon Valley Congresswoman: Web Seizures Trample Due Process (and Break the Law)*, Ars Technica (Mar. 14, 2011), http://arstechnica.com/tech-policy/news/2011/03/ars-interviews-rep-zoe-lofgren.ars.

2.      **The Government's Overbroad Seizures Violated the First Amendment Rights of Internet Users Who Wished to Access Protected Material on Petitioner's Site.**

This overbroad seizure violated the First Amendment rights of Internet users who wished to access material on Petitioner's site.  The First Amendment not only "embraces the right to distribute literature," it also "necessarily protects the right to receive it." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom") (emphasis in original).  This Constitutional right to receive information applies specifically to information disseminated over the Internet.  *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (invalidating law that restricted adults' right to access information on the Internet).

Petitioner's site, previously accessible through the seized domain name, had users and readers from around the world, including the United States.  *See* Pl.'s Pet., Docket No. ("DN") 1 at 7; Decl. of Igor Seoane Minan In Supp. of Puerto 80's Pet. for Release of Seized Property, DN 2 at ¶ 9.  Accordingly, the government's domain name seizure implicated the public's First Amendment interests in receiving documents and information.

3.      **The Harm to First Amendment Rights Resulting from The Government's Seizure Is Far Greater Than Necessary to Further an Important Governmental Interest.**

The impact on speech resulting from domain-name seizure is far beyond what is necessary to further the government interest.  The government alleges that links (located on pages accessible through Petitioner's domain names) to infringing content — *i.e.*, pointers to content accessible elsewhere on the Internet — constituted criminal copyright infringement.  *See* Aff. in Supp. of Appl. for Seizure Warrant Pursuant to 18 U.S.C. §§ 2323(a)(1)(A)-(B) [of Daniel Brazier, signed January 31, 2011], DN 3, Ex. E at ¶¶ 40-44.  By seizing Petitioner's domain names, however, the government blocked access to *all* content contained on Petitioner's site, including obviously non-infringing content,

such as user-created forums, discussions, and technical tutorials.  Decl. of Igor Seoane Minan, DN 2 at ¶ 6.

This tactic, as discussed above in Section III, was dramatic and unprecedented. While the government may pursue actions that further important interests, "it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (citing *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976)). "Broad prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone . . . ." *NAACP v. Button*, 371 U.S. 415, 438 (1963) (citations omitted).

The fact that some or all of the information available through the targeted domain names may still be available to the public, by (for example) using another domain name or by typing in the site's numerical IP addresses directly, does not change the analysis. The Supreme Court has repeatedly held that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised elsewhere." *Schneider v. New Jersey*, 308 U.S. 147, 163 (1939); *accord Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976) ("We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means . . . .").

The government has many alternative and less burdensome means to address the legitimate interests that it wishes to further.  It could have, for example, sought to identify and prosecute the individuals who allegedly engaged in the criminal copyright infringement.  The copyright holders themselves could have similarly sought to utilize provisions of the Copyright Act to identify the perpetrators and hold them civilly responsible.  Either tactic would have approached the alleged harm in a more surgical manner that would have safeguarded the First Amendment interests at stake.  *See Maryland v. Macon*, 472 U.S. 463, 468 (1985) ("The First Amendment imposes special

constraints on searches for and seizures of presumptively protected material, and requires that the Fourth Amendment be applied with 'scrupulous exactitude' in such circumstances.") (internal citation omitted).  The government's action in this case failed to sufficiently target alleged wrongdoers, and ultimately suppressed far more speech that the First Amendment would permit.

### B.   **The Government's Seizure of Petitioner's Domain Names Violated the Procedural Requirements of the First Amendment.**

The government's actions were also procedurally flawed: the seizure of Petitioner's domain names also plainly violated the First Amendment requirement that any prior restraint of speech "take[] place under procedural safeguards designed to obviate the dangers of a censorship system."  *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (quoting *Freedman v. Maryland*, 380 U.S. 51, 58 (1965)).  Indeed, there is a "heavy presumption against [the] constitutional validity" of any prior restraint of speech.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (emphasis added); *see also Se. Promotions, Ltd.*, 420 U.S. at 559-60 ("The presumption against prior restraints is heavier — and the degree of protection broader — than that against limits on expression imposed by criminal penalties.").  The government obtained a seizure order based not on a judicial finding of illegality, but rather on an *ex parte* proceeding that required only a showing of probable cause.  Such bare procedure is insufficient to satisfy the Constitution when the property to be seized is an instrumentality of speech.

### 1.   **First Amendment Prohibition on Prior Restraints.**

The government's use of 18 U.S.C. §§ 2323(a)(1) (A)-(B) and 18 U.S.C. § 981 to obtain pre-judgment process to block access to domain names (and the internet content to which they point) clearly constitutes a prior restraint of speech.  *See, e.g.*, *Alexander v. United States*, 509 U.S. 544, 549-50 (1993) ("The term 'prior restraint' is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." (internal citations

and quotations omitted)); *compare Bantam Books*, 372 U.S. at 70 (holding agency practice of "requesting" book stores remove objectionable material "subject[s] the distribution of publications to a system of prior administrative restraints").

Prior restraints are subject to a strong presumption of invalidity under the First Amendment. *See, e.g.*, *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1305 (1983); *Staub v. City of Baxley*, 355 U.S. 313, 321 (1958). The Supreme Court has only permitted prior restraint schemes "where it operated under judicial superintendence and assured an almost immediate judicial determination of the validity of the restraint." *Bantam Books*, 372 U.S. at 70-71 (citing *Kingsley Books, Inc. v. Brown*, 354 U.S. 436 (1957)). *See also FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230 (1990) ("[T]he availability of prompt judicial review [is necessary to] satisfy the 'principle that the freedoms of expression must be ringed about with adequate bulwarks.'") (quoting *Bantam Books*, 372 U.S. at 66).

Thus, the Court has articulated clear procedures that must be followed in order for governmental restraints to survive a First Amendment challenge. Specifically, government actions that significantly restrain speech must include: (a) an adversarial hearing, (b) with the burden on the censor, and (c) with clear opportunity for prompt judicial review and appeal. *See, e.g.*, *Freedman*, 380 U.S. at 58-59; *Se. Promotions*, 420 U.S. at 560. The seizure procedures used in this case fell far short of this standard.

## 2. A Mere Showing of "Probable Cause" Does Not Justify a Prior Restraint.

The Supreme Court has recognized that among "the special rules applicable to removing First Amendment materials from circulation" is "the admonition that probable cause to believe that there are valid grounds for seizure is insufficient to interrupt the sale of presumptively protected books and films." *Fort Wayne Books v. Indiana*, 489 U.S. 46, 65-66 (1989). The Court has noted that its cases "firmly hold that mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from

circulation." *Id.* at 66. *See also, e.g.*, *New York v. P.J. Video, Inc.*, 475 U.S. 868 (1986); *Blount v. Rizzi*, 400 U.S 410, 420 (1971) (courts cannot prohibit the distribution of materials via U.S mail based solely on a probable cause determination of obscenity). Thus, a court cannot deny access to expressive materials it decides are *probably* illegal; it must determine that they *actually are* illegal.

That did not happen here. Instead the government sought and obtained authority to seize the sites based solely on a showing of "probable cause" that the domain names were "used or intended to be used to commit or facilitate the commission of criminal infringement of copyrights in violation of 18 U.S.C. § 2319." *See* Aff. in Supp. of Appl. for Seizure Warrant Pursuant to 18 U.S.C. §§ 2323(a)(1)(A)-(B) [of Daniel Brazier, signed Jan. 31, 2011] DN 3, Ex. E at ¶ 5.

The First Amendment requires that before blocking access to those sites, the Court should have come to a definitive conclusion about whether they contained such illegal materials. The process that the government used here required the Court to determine merely whether there was "probable cause" that materials on Petitioner's site were illegal or facilitated illegal behavior. That does not suffice.

### 3.    The Lack of a Prior Adversarial Hearing Renders the Domain Name Seizure Invalid.

The civil forfeiture process invoked by the government is additionally deficient in that it fails to require an adversarial hearing before the domain name seizure was authorized. The Supreme Court has held that a "publication may not be taken out of circulation completely until there has been a determination of [illegality] after an adversary hearing." *Fort Wayne Books*, 489 U.S. at 63; *see also Heller v. New York*, 413 U.S. 483, 492-93 (1973); *Marcus v. Search Warrant of Property*, 367 U.S. 717, 735 (1961).

The process at issue here does exactly what *Fort Wayne Books* says is not permissible — it denies access to certain web site content, removing it from "circulation"

within the domain-name system, without a prior hearing.  When the goal or effect of the seizure is to block the public's access to a challenged work — as is clearly the objective here — the adversarial hearing *must* take place before the seizure.  *See Fort Wayne Books*, 489 U.S. at 63.  As no such procedure is contemplated by the statute, let alone offered here, the seizure authorized pursuant to that statutory scheme was unconstitutional.

### C.   The Seizure Warrant Ignored the Judgment of Two Spanish Courts, Disregarding Important International Norms.

Puerto 80's activities, specifically the Rojadirecta websites, have been found legal by two Spanish courts.  This fact was apparently not considered by the Court before issuing the warrant.  Either the government chose to not to share this fact, which should have emerged in any reasonable preliminary investigation, or the government itself was unaware of it, which suggests it did not conduct such an investigation.  Principles of comity and sound public policy dictate that the matter should have been raised and carefully considered by court before the warrant issued.

#### 1.   The Seizure Order Should Not Have Issued Without Consideration of the Foreign Judgment of Non-Infringement.

Decisions of foreign courts are not binding on the U.S. judiciary; however, it is a "well-settled rule" that unless the findings offend fundamental standards of procedural fairness or public policy, foreign judgments are generally conclusive.  *See Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 408 (2d Cir. 2009) (citing *Ackermann v. Levine*, 788 F.2d 830, 837 (2d Cir. 1986)); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985) ("comity will be granted to *the decision* or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated." (emphasis added)).  *Cf. Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 631 (2d Cir. 1976) (holding that "a foreign judgment may not be collaterally attacked 'upon the mere assertion of the party that the judgment was erroneous in law or in fact'"

and requiring "[c]lear and convincing evidence" to attack a foreign judgment) (internal citations omitted)).  Normally the issue arises where a party seeks to enforce a foreign judgment, but the principles apply more broadly.  *See, e.g.*, *Kenner Products Co. v. Societe Fonciere et Financiere Agache-Willot*, 532 F.Supp. 478, 479 (S.D.N.Y. 1982) (finding principles of international comity as well as U.S. public policy required granting motion for suspension pending French bankruptcy determination)

The standard for exceptions is high and rarely met.  *Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 489 F.3d 474, 479 (2d Cir. 2007); *Ackermann*, 788 F.2d at 841.  Indeed, comity principles apply even where a U.S. legal proceeding would have produced a different result, either procedurally or on the merits.  *See, e.g.*, *Sarl Louis Feraud Int'l*, 489 F.3d at 479; *Pariente v. Scott Meredith Literary Agency*, 771 F. Supp. 609, 616 (S.D.N.Y. 1991).

In the case of Rojadirecta, that standard was not applied, much less met.  There is no reason to believe the Spanish rulings were procedurally unsound or offensive to public policy.  Indeed, on the limited facts available in the record, U.S. copyright law may have dictated the same outcome, at least in the context of criminal infringement.  *See* Mem. of P. &. A. in Supp. of Puerto 80's Pet. for Release of Seized Property and in Supp. of Req. for Expedited Briefing and Hr'g of Same, DN 5.  And at the very least the matter should have been submitted to the Court for appropriate consideration before any warrant issued.

### 2.   The Rojadirecta Seizure Sends a Dangerous Signal.

As the Second Circuit has noted, respect for foreign judgments is good policy: "The increasing internationalization of commerce requires 'that American courts recognize and respect the judgments entered by foreign courts to the greatest extent consistent with our own ideals of justice and fair play.'"  *Ackermann*, 788 F.2d at 845 (citing *Tahan v. Hodgson*, 662 F.2d 862, 868 (D.C. Cir. 1981)).  Such respect promotes the fair treatment of foreign entities and citizens, and encourages other countries to

accord U.S. business and citizens the same respect.  By choosing instead to ignore the judgments of foreign courts, the U.S. government has undermined that important policy.

The effect may be felt well beyond the commercial context.  Simply put, if the United States courts allow — with no adversarial hearing and on a low legal standard — the seizure of foreign-based content that is lawful in the home country, then that will set an example for other countries to seek to seize U.S.-based speech that is perfectly lawful in this country.   As one example, U.S.-based websites have provided a crucial safe haven for political speech, including speech that is critical of foreign governments, in part because U.S. law offers strong protections for political commentary.  If such a website were seized by a foreign government (even though the content is hosted in the U.S.), that action would likely be subject to intense criticism, including disapproval by the U.S. government.[21]  Unfortunately, it would be all too easy for the foreign censor to cite to the circumstances of *this case* as reason to ignore such criticism.  Once the United States goes down the path of seizing websites hosted around the world, we will be less able to complain when other countries turn around and do the same thing to speech hosted here.

## IV.   CONCLUSION

For the foregoing reason, Amici urge the Court to grant Petitioner's request for return of property.

Respectfully submitted,

Date:  June 20, 2011                    By   S/  Lucian Ulmet

Lucian Ulmet, Esq.
Kuzas Neu
318 Newman Springs Road
Red Bank, NJ 07701
Phone:  (732) 784-1791
Fax: (866) 642-6260
Bar # LU4810

---

[21] *See, e.g.*, Hillary Clinton, U.S. Sec'y of State, *Internet Rights And Wrongs: Choices & Challenges In A Networked World*, U.S. Dep't of State (Feb. 15, 2011), http://www.state.gov/secretary/rm/2011/02/156619.htm.

On the Brief:

Corynne McSherry, Intellectual Property Director
Matthew Zimmerman, Senior Staff Attorney
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Phone:  (415) 436-9333
Fax:  (415) 436-9993

Attorneys for Amici Curiae